United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADNAN KHAN, | No. C 10-3949 SI |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| RAUL LOPEZ, Warden, | |
| Respondent. | |

Petitioner Adnan Khan, a prisoner at the California State Prison in Solano, filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner responded with a traverse. For the reasons discussed below, the petition is denied.

**BACKGROUND**

On February 23, 2006, a jury found petitioner guilty in count one, of first degree murder, *see* Cal. Penal Code § 187, and in count two, of second degree robbery *see* Cal. Penal Code §§ 211 and 212.5(c). Respondent's Exhibit ("Resp. Exh.") A4 at 1082, 1084. As to count one, the jury found not true the special circumstance allegation that petitioner killed the victim during the course of a robbery, *see* Cal. Penal Code § 190.2(a)(17). *Id.* at 1083. On December 15, 2006, the court sentenced petitioner, on count one, to an indeterminate term of 25 years to life in prison, and stayed the imposition of sentence on count two, pursuant to Cal. Penal Code § 654. *Id.* at 1218-20. On March 25, 2009, the California Court of Appeal affirmed the judgment. Resp. Exh. F. A petition for review was summarily denied by

the California Supreme Court on July 8, 2009. Resp. Exh. G, H. A petition for writ of habeas corpus was summarily denied by the California Supreme Court on June 8, 2011. Resp. Exh. I, J.

The facts, as described by the California Court of Appeal, are as follows:

We briefly summarize evidence presented at trial relevant to our discussion of this appeal. The parties do not dispute that on March 24, 2003, Page stabbed McNutt repeatedly outside Page's van immediately after defendant hit him over the head inside the van in an effort to steal marijuana from him, as part of a crime concocted with two others earlier in the day. The jury viewed a videotape of defendant's interview with police on March 25, 2003, the day after the incident, and was provided with a transcript of this interview. In response to the first question about what happened, defendant said regarding McNutt: "Man, I have no idea, man. We got–we were basically supposed to rough him up. We had no weapons, nothing, you know? And then I don't even know the guy, I had no idea–I don't know, man."

Defendant indicated that McNutt "had some marijuana. And then, you know, we don't have any money and are not gonna buy it. And you know, like let's take it from him[.]" He stated that he did not have any weapons, that he "hit him in his head 'cause this guy, he looked back and tried to, you know, tried to get me, wrestle with me or something. So I just, my first instinct, just hit him. So I hit him and then that's when he's all like he tried to get out the car." He continued: "And then [Page], I thought he was just fighting with him, he was just started fighting outside. So I ran out, I went–had to go through the front 'cause the side door doesn't open, went to the front. [¶] I'm like, 'get in the car.' I'm screaming. I was like, 'Get in the car, [Page]. Get the fuck in,' just going crazy, you know, 'Get in the car. What the hell are you doing?' [¶] And then I thought he was swinging at him, you know, punching him and shit. And I just seen him bleeding and stuff. And I'm like, 'Get in the car.' I'm hella yelling, I don't know, and then we just left. [¶] I'm like, you know, 'What the fuck did you do?' [¶] He's like, 'I stabbed him.' [¶] I go, 'What?' I had no fucking idea. I told him, 'Don't get me fucking involved.' I didn't–I don't even do shit like this. I didn't get arrested like this, you know."

According to defendant, Page just "went crazy" when he stabbed McNutt. "It's like [Page] snapped or something, all of a sudden. You know, I don't know what the fuck happened."

In the course of the interview, defendant stated that he and three others, including Page, had planned earlier in the day to steal the marijuana from McNutt. He and Page were supposed to meet McNutt and, when McNutt showed them the marijuana, he was going to just grab it and run. Defendant stated "[w]hen he was talking to them, I was there to run with it, man, you know." He repeated more than once that his role was just to grab the marijuana and run. He explained that, "[o]nce it's in my hand, I was gonna run as fast as I can, and [Page] was gonna come just get me in the car." Defendant did not explain how Page was to leave McNutt behind so that he, Page, could pick up defendant in his car.

Upon further questioning, defendant stated, "We're not supposed to have any weapons. I was supposed to rough him up and take–you know, I was supposed to run, first of all." Defendant also stated, "I didn't know [Page] had a knife. I didn't know he did anything. He didn't tell me shit. I didn't have–we didn't

2

have no weapons. We were supposed to–you know what I'm saying, I was supposed to run it. That was the fucking plan."

Defendant made further references to the plan. He stated about the accomplices who he said initiated the idea for the crime, "they brought [McNutt] to get jacked, you know." When asked if he knew McNutt was seriously injured or dead, he replied, "No, I didn't know that. See, I didn't know he was like that. I didn't know he was gonna be hurt that bad. Once I found out he shanked him, I was like, shit. You know, that shit–we had–," and after a brief interruption, added, "–no weapons were supposed to be involved."

Later in the interview, defendant explained that while they intended to meet McNutt in the park at first, he and Page ended up in Page's van following McNutt's car down the street, at McNutt's suggestion. They pulled over and, as defendant approached McNutt's car, McNutt exited, indicated the marijuana was in his pocket, and suggested that they go in Page's van to conduct the transaction. Defendant thought that he could not run now. When he was asked if this was when he "came up with the plan to just cock him one time," defendant replied: "No, I wasn't even gonna cock him. I was gonna basically do what I was gonna do. I was gonna take it all and just tell him to get out or I'm gonna hurt you, you know, rough–you know, we didn't have no weapons, nothing, so that's all we were left with, you know."

The following exchange then occurred:

"DET. SCHNEIDER: Well, but you said, you said in the beginning when I first talked to you, you said that the plan was just to rough him up.

"MR. KHAN: Yeah.

"DET. SCHNEIDER: But the plan, but the plan–

"MR. KHAN: Just to get–if he goes down there to get the weed, to get the weed.

"DET. SCHNEIDER: But then the plan, you tell me that the plan was to do a grab and run.

"MR. KHAN: No.

"DET. SCHNEIDER: So at what point did it change?

"MR. KHAN: That's what I'm saying, it changed 'cause we were supposed to meet him in the park. Hella shit, just–we thought of hella shit.

"DET. SCHNEIDER: Okay,.

"MR. KHAN: I mean not hella shit but–

"DET. SCHNEIDER: When did it change?

"MR. KHAN: When we didn't meet him in the park. It didn't change, it just happened. Nothing changed, you know. We didn't like physically change nothing. It just happened. He came to the car, you know, and I don't know what to do. [¶] They told me, you have to get, you know, you have to get this

3

quarter. I'm thinking I got to get it somehow, you know."

At trial, one of the other participants in the crime, David Cedeno, testified that as of March 24, 2003, defendant was staying at Cedeno's Pittsburg residence, having met Cedeno three to four weeks before; Page was Cedeno's friend. That morning, Cedeno and one of his other friends, Robert Wilson, purchased a quarter-ounce of marijuana from a man who called his cousin, McNutt, to arrange an additional purchase, and told Cedeno and Wilson that McNutt would come to Antioch about 5:00 p.m. Sometime that afternoon, Cedeno, Wilson, defendant, and Page were smoking marijuana together when Wilson mentioned McNutt and "started talking about doing ... a drug rip." He said "that we wouldn't have to touch them or anything, we just take it and run."

Cedeno testified that because he and Wilson knew the seller, they arranged for defendant and Page to steal the marijuana. Cedeno would represent to McNutt that defendant was Cedeno's cousin and direct McNutt to a nearby park, where Page or defendant would grab the marijuana and run, and the other would be driving the car. Cedeno discussed with defendant, Page, and Wilson "that no violence was to happen" to McNutt.

Shortly before 5:00 p.m., defendant and Page went to the park. However, McNutt and a friend did not arrive until approximately 7:00 p.m. Eventually, McNutt suggested they just "go down the street somewhere," to conduct the transaction and Cedeno agreed, accompanying McNutt and his friend in McNutt's vehicle and instructing defendant and Page by phone to follow McNutt's vehicle. McNutt drove a short distance and he and Page pulled over. McNutt, defendant, and Page exited their vehicles and greeted each other. Cedeno still understood that defendant would grab the marijuana and run, and that no weapons would be involved.

McNutt then indicated he wanted to conduct the transaction in Page's van, where he could weigh the marijuana with a scale. Cedeno said to weigh it in the van. He did not hear Page or defendant object to going in the van. No one suggested doing the transaction anywhere else. Cedeno thought that McNutt would give defendant the marijuana to weigh in the van, and that defendant would run from there.

Cedeno remained in McNutt's car and acted as if everything was normal. He heard a loud thump on the back of McNutt's car, and saw what he thought was Page and McNutt fighting. He got out of the car, saw McNutt wobbling, Page in the middle of the street, and defendant drive up in Page's car, yell at Page to get in the car and, when Page did so, drive away. Cedeno then discovered that McNutt had been stabbed, and learned later that night he had died.

Resp. Exh. F at 1-6.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

4

clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of §2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *See Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of §2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Id.* at 411. Rather, the state court's application of federal law must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. In this case, the last reasoned opinion is the California Court of Appeal's March 25, 2009 decision affirming petitioner's conviction on direct appeal. Resp. Exh. F. However, "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

5

**DISCUSSION**

As grounds for federal habeas relief, petitioner asserts that (1) his constitutional rights to present a defense and to have the jury determine each element of the offense were violated by the trial court's exclusion of evidence of his co-participant's mental illness, and its instruction to the jury not to consider such evidence to negate the elements required for felony murder; (2) trial counsel was ineffective for failing to adequately preserve these objections; and (3) appellate counsel was ineffective for failing to argue that his sentence constituted cruel and unusual punishment. First Amended Petition for Writ of Habeas Corpus ("Hab. Pet.") at 22, 45.

## I.    Evidentiary Error

Petitioner contends that Page's mental illness was relevant to his defense because, as a result of his illness, Page acted under a delusion that he was assaulting someone unrelated to the robbery, thereby negating the logical nexus between the robbery and the homicide and showing that he lacked the specific intent for the underlying felony. Hab. Pet. at 22. Respondent argues that petitioner's claim is procedurally barred due to the state court's ruling that he waived his appellate arguments by failing to object at the motion in limine hearing. Answer at 10-11.

### A.    Factual background

Petitioner raised the issue of Page's mental illness in two motions to continue the trial filed in June and October of 2005. Resp. Exh. F at 7. In the second motion, petitioner also asserted that expert medical evidence would be introduced to show that Page's mental condition did not allow him to formulate the necessary intent to steal. *Id.* At the hearing on the October motion, petitioner argued that, based on Page's mental state – i.e. that he thought he was killing (or assaulting) someone entirely unrelated to the robbery – there was no logical nexus between the robbery and the homicide. *Id.* at 7-8. The trial court denied the motion to continue, concluding that there was a logical nexus between the robbery and the homicide and that Page's mental state was not relevant to petitioner's liability. *Id.* at 8.

Subsequently, at the motion in limine hearing, the parties stipulated to be bound by the court's

pretrial rulings. *Id.* at 8. As such, with respect to the issue of whether expert testimony would be admitted describing Page's psychotic state at the time of the killing, petitioner focused on its relevance to his own state of mind and whether he acted with the reckless indifference required to support the special circumstance allegation; he did not renew his claim that Page's mental state was relevant to the charge of felony murder. *Id.* at 8-9. The court conducted a hearing pursuant to section 402 of the California Evidence Code to determine the admissibility of the expert's testimony. *Id.* at 9. At the hearing, the expert opined that Page was psychotic at the time he killed the victim, but also indicated that Page knew he was taking part in a planned marijuana robbery. *Id.* at 10-11. After the expert's testimony, petitioner again argued that the testimony was relevant to whether petitioner acted with reckless indifference to human life. *Id.* at 11. After hearing from the parties, the trial court ruled that the expert would not be allowed to testify regarding Page's mental condition on the day in question, but allowed him to testify about Page's mental illness as it related to the "reckless indifference" issue. Resp. Exh. B1 at 192-94.

Prior to the expert's trial testimony, counsel for petitioner renewed his objection to the court's ruling prohibiting his expert from testifying as to Page's mental state at the time of the killing. Resp. Exh. B4 at 777-78. The court informed the parties that it would incorporate by reference its rulings from the in limine hearings and, at the request of the prosecutor, read a limiting instruction to the jury instructing them how to consider the expert's testimony. Resp. Exh. B4 at 778-780.

### B. Procedural default

The state court acknowledged that petitioner raised his "logical nexus" argument in the course of seeking a continuance, allowing the trial court to address the relevance of Page's mental state as it related to the charge of felony murder. *Id.* at 13. Nevertheless, the state court found that petitioner did not raise the argument in his motion in limine, and the parties' stipulation to be bound by the court's pretrial rulings was entered after petitioner filed his motion in limine. *Id.* Based on the foregoing, the state court concluded that petitioner had waived his appellate arguments because there was no proffer of evidence with respect to that specific issue before the court at the time. *Id.*

However, immediately prior to his trial testimony petitioner clearly and expressly renewed his

7

objection to the trial court's ruling preventing his expert from testifying regarding Page's mental state at the time of the killing. Resp. Exh. B4 at 777-78. Further, petitioner again renewed his objection prior to the case going to the jury. Resp. Exh. B5 at 1032.

California's contemporaneous objection rule, which requires objection at the time of trial to preserve an issue for appeal, is an adequate procedural bar "when a party has failed to make any objection to the admission of evidence." *See Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002). In this case, petitioner's objection at trial was sufficient to preserve the matter for appellate review, as it allowed the trial court a reasonable opportunity to rule on the merits of the objection before excluding the expert testimony. *Id.* at 1125.

In any event, even though the state court discussed procedural default at some length, the court also reached the merits of the claim, finding that the trial court was within its discretion to exclude the disputed evidence. Resp. Exh. F at 14. When the state court discusses a procedural default but also reaches the merits of a claim, denial of the claim cannot be said to have relied on the procedural default. *See Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir. 2001). The state court must clearly and expressly state that its judgment rests on a state procedural bar in order for federal review to be precluded. *Id.* (internal quotations, citation omitted). Because the state court discussed both procedural default and the merits without expressly holding that the procedural default was the basis the denial, the procedural default does not operate to bar federal review. *Id.* Respondent's reliance on *Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999) is misplaced, because in *Poland* the state court dismissed the claim on procedural grounds without explanation, but did not invoke a procedural bar as the basis of its ruling. *See Lambright v. Stewart*, 241 F.3d 1201, 1206 (9th Cir. 2001).

In sum, petitioner is not procedurally barred from challenging the trial court's exclusion of expert testimony describing Page's mental state at the time of the killing.

**C.     Merits**

Turning to the merits of the claim, petitioner contends that the appellate court's decision upholding the trial court's exclusion of the expert testimony was contrary to his clearly established Sixth Amendment right to present a defense. Hab. Pet. 31. Specifically, petitioner claims that the trial court

erred by excluding expert testimony indicating that Page killed the victim while suffering from a psychotic delusion because, under California law, evidence of a coparticipant's private motive is relevant to the jury's determination whether the homicide and robbery were part of the single, continuous transaction required for proving guilt of felony murder. *Id.*

As discussed above, the trial court conducted a section 402 hearing to determine the admissibility of expert testimony regarding Page's mental state at the time of the killing. Resp. Exh. F at 9. After hearing from the expert and considering the arguments of the parties, the trial court was convinced that there was an insufficient foundation to admit expert testimony that Page was suffering from a psychotic episode at the time of the homicide. Resp. Exh. B1 at 192-93, F at 15. The state appellate court determined that the trial court did not abuse its discretion by excluding the evidence on foundational grounds. Resp. Exh. F at 16.

Although petitioner presents his argument in terms of a Sixth Amendment violation, his specific claim is premised on an alleged evidentiary error under California law; namely, whether the evidence demonstrated that the robbery and homicide were part of a single, continuous transaction, as required for proving guilt of felony murder. Hab. Pet. at 34. Whether expert testimony was incorrectly excluded under state law "is no part of a federal court's habeas review of a state conviction" *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 67-68.

Turning to the question of whether exclusion of the expert testimony violated petitioner's federal constitutional rights, the Supreme Court has acknowledged that the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *See Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (citations omitted). However, there is no clearly established federal law providing that a state court's discretionary decision to exclude testimony violates a defendant's right to present a defense. *See Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2009). Moreover, the Court has recognized that state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. *Id.* (internal quotation marks and citations omitted).

9

In this case, the state appellate court reasonably determined that the trial court was within its discretion to exclude the evidence. First, there was an insufficient foundation to support the expert's opinion that Page killed the victim while in a psychotic state, as the opinion was based largely on speculation. Resp. Exh. F at 16. Second, the expert's testimony regarding Page's mental state was not relevant to the charge of felony murder because the evidence showed that the plan, from the very beginning, was to rob the victim through either force or threat, leaving no dispute as to whether Page had formed the specific intent to rob the victim prior to the fatal attack. Resp. Exh. F at 16-19. The only requirement under the felony murder rule is the specific intent to steal the victim's property – which was satisfied because both petitioner and Page clearly intended to steal marijuana from the victim. *Id.* at 22. Further, even if Page killed the victim while in a psychotic state, the overall chain of events demonstrated a logical connection between the homicide and the robbery, beginning with the parties' initial agreement and culminating in the homicide that occurred immediately after petitioner hit the victim and tried to take the marijuana from him. *Id.* at 19-22.

Accordingly, the state appellate court's determination affirming the trial court's exclusion of expert testimony regarding Page's mental state at the time of the killing did not violate petitioner's Sixth Amendment right to present a defense, and was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d); *Moses,* 555 F.3d at 758-59.

## II.     Jury Instructions

Petitioner contends that the trial court's instructions to the jury violated his clearly established constitutional right to have the jury determine whether all the elements of first degree felony murder had been proven. Hab. Pet. at 36-38. Petitioner claims that the court's instructions relieved the jury of its obligation to determine whether all the elements of first degree felony murder had been proven, because the jury was prevented from considering the critical factual issue of whether the killing and the robbery were part of a continuous transaction. Hab. Pet. at 38. Respondent argues that the state court did not unreasonably apply clearly established federal law by denying petitioner's claims for relief. Answer 22.

### A. Factual background

The trial court allowed petitioner to argue that Page's mental state on the day of the homicide negated the reckless indifference element necessary to support the special circumstance allegation, but prevented petitioner from arguing that Page's mental illness was in any way relevant to the issue of felony murder. Resp. Exh. B5 at 903-11, 1030-32.

The jury was given CALJIC No. 8.10, instructing them on the elements of murder as follows:

> Defendant is accused in Count One of having committed the crime of murder, a violation of Section 187 of the Penal Code.
>
> Every person who unlawfully kills a human being during the commission of robbery, is guilty of the crime of murder in violation of Penal Code Section 187.
>
> A killing is unlawful, if it was neither not justifiable nor excusable.
>
> In order to prove this crime, each of the following elements must be proved:
>
>     1. A human being was killed.
>     2. The killing was unlawful; and
>     3. The killing occurred during the commission of robbery.

Resp. Exh. A3 at 1025.

Further, the jury was given CALJIC No. 8.21, instructing them on the elements of first-degree felony-murder as follows:

> The unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs during the commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime.
>
> The specific intent to commit robbery and the commission of that crime must be proved beyond a reasonable doubt.
>
> In law, a killing occurs during the commission of a robbery, so long as the fatal blow is struck during its course, even if death does not then result.

*Id.* at 1026.

The jury was also instructed on the "escape rule," pursuant to CALJIC No. 8.21.1, *see People v. Wilkins*, 56 Cal. 4th 333, 343 n.2 (2013), as follows:

> For the purposes of determining whether an unlawful killing has occurred during the commission of a robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time.
>
> A robbery is still in progress after the original taking of physical possession of the

11

> stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property.
>
> A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with the property.

*Id.* at 1029.

The jury was also given a pinpoint instruction as follows:

> A nonkiller's liability for felony murder does not depend on the killer's subjective motivation but on the existence of objective facts that connect the act resulting in death to the felony the nonkiller committed.

*Id.* at 1028.

### B. Legal standard

The formulation of jury instructions is a question of state law and is not cognizable in habeas proceedings. *See Estelle,* 502 U.S. at 67-68. A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir.1992) *citing Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir.1995). Where a given jury instruction is ambiguous, a reviewing court must determine whether there is a "reasonable likelihood" that the jury was misled. *See Murtishaw v. Woodford*, 255 F.3d 926, 967 (9th Cir. 2001).

The Supreme Court has held that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *See Matthews v. United States*, 485 U.S. 58, 63 (1988). The failure to provide adequate instructions on a defense theory of the case constitutes a denial of due process under the Fourteenth Amendment. *See Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir.2002); *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir.1999). However, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *See Henderson v. Kibbe*, 431 U.S. 145,155 (1977). Thus where the alleged error is the failure to give an instruction, the habeas petitioner's burden is especially heavy. *Id.*

### C. Discussion

#### 1. Continuous transaction

Petitioner claims that the court's instructions removed from the jury's consideration the issue of whether the killing and the robbery were part of a continuous transaction, thereby relieving the jury of its obligation to determine whether all the elements of felony murder had been proven. Hab. Pet. at 38. The flaw in petitioner's argument is that, under California law, the "one continuous transaction" analysis does not establish an element of the offense, rather, it is used as an appellate standard of review to determine whether there was sufficient evidence to support an instruction or a conviction on felony-murder. *See People v. Sakarias*, 22 Cal. 4th 596, 624 (2000). While evidence of a single continuous transaction may be sufficient to justify an instruction or conviction on felony murder, it is the jury's role to determine whether a murder was committed in the perpetration of the underlying felony, not whether the murder took place as part of a single continuous transaction. *Id.* In instructing the jury on the elements of felony murder, the trial court properly relied on the language in California Penal Code section 189, which does not require the jury to find that the underlying felony and the killing were part of one continuous transaction. Resp. Exh. A3 at 1027. Contrary to petitioner's assertion, the jury's determination of whether the killing was committed "in perpetration of" the robbery, was not taken out of their hands, as they were expressly instructed on that particular element. Resp. Exh. A3 at 1025-26.

#### 2. Retroactive application of the law

Petitioner also contends that the state court's decision violated his right to due process because it failed to give him fair warning that his contemplated conduct constituted a crime. Hab. Pet. 39-40. Specifically, petitioner contends that the state court's decision changed state law to permit exclusion of evidence of a coparticipant's private motivation to kill the victim, which was a new theory of felony murder liability that was retroactively applied to him. *Id.* at 39. This argument lacks merit. As discussed above, evidence of a continuous transaction is not required to prove guilt of felony murder, but it may go to the sufficiency of the evidence to support a conviction for felony murder. *See Sakarias*, 22 Cal. 4th at 624. Therefore the state appellate court's decision finding that the jury was properly instructed on the elements of felony murder under California state law did not create a new theory of liability that

13

retroactively affected petitioner.

### D. Conclusion

Accordingly, the state appellate court's determination that the trial court's instructions did not relieve the jury of its obligation to determine whether all the elements of first degree murder had been proven beyond a reasonable doubt, was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

## III. Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective for failing adequately to proffer evidence of Page's mental illness and failing adequately to object to the trial court's instructions. Hab. Pet. at 42. Petitioner also contends that appellate counsel was ineffective because he failed to argue that petitioner's sentence was cruel and unusual. Respondent argues that the state court's decision was not unreasonable as petitioner's claims are without merit. Answer at 24, 28.

### A. Legal standard

In order to succeed on an ineffective assistance of counsel claim, the petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires him to show deficient performance and prejudice. Deficient performance requires a showing that trial counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003). To establish prejudice, petitioner must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. If a petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387, 391-405

14

(1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir.1989).

Petitioner's ineffective assistance of counsel claims were first raised in a petition for writ of habeas corpus before the California Supreme Court. Resp. Exh. I. Because the California Supreme Court summarily denied the petition with no explanation, Resp. Exh. J, under AEDPA this Court must conduct an independent review of the record to determine whether the state court's decision denying petitioner's claims of ineffective assistance of counsel was an unreasonable application of clearly established federal law. *See Delgado v. Lewis*, 223 F. 3d at 976, 982 (9th Cir. 2000).

**B. Merits**

**1. Trial counsel**

Petitioner acknowledges that trial counsel first raised the issue of Page's mental illness in two motions to continue the trial that were filed in June and October of 2005. Hab. Pet. at 22, Resp. Exh. F at 7. The trial court denied the motion after concluding that Page's mental illness was not relevant to petitioner's liability. Resp. Exh. F at 8. Counsel later filed a motion in limine seeking to present expert testimony regarding Page's mental state. Hab. Pet. 22, Resp. Exh. A1 at 338-40. The trial court ruled that the expert could testify about Page's mental illness as it related to the special circumstance allegation, but could not testify regarding Page's mental condition on the day in question. Resp. Exh. B1 at 192-94. Prior to the expert's trial testimony, counsel for petitioner renewed his objection to the court's ruling prohibiting his expert from testifying as to Page's mental state at the time of the killing. Resp. Exh. B4 at 777-78. The court ruled in accordance with its rulings from the in limine hearings, and read a limiting instruction to the jury informing them how to consider the expert's testimony. Finally, counsel again raised the issue of Page's mental state at the jury instruction conference. After hearing argument from the parties, the court, in accordance with its prior rulings, concluded that Page's subjective mental state was not relevant to the issue of petitioner's liability for felony murder. Resp. Exh. B5 at 905-11. Counsel lodged a timely objection to the court's pinpoint instruction to this effect. *Id.* at 911.

The court finds that counsel's performance did not fall below an objective standard of reasonableness, as the record reflects that counsel repeatedly attempted to argue that Page's mental state at the time of the killing was relevant to the issue of whether petitioner was guilty of felony murder, and lodged timely objections to the court's instructions that prevented the jury from considering this evidence. The mere fact that counsel was unsuccessful in his efforts does not render his performance deficient. *See Strickland*, 466 U.S. at 689-90. In light of this finding, it is unnecessary to address the prejudice prong of the *Strickland* test. *See Siripongs*, 133 F.3d at 737.

### 2. Appellate counsel

Petitioner contends that appellate counsel failed to argue that his 25 years to life sentence violated the state and constitutional bans on cruel and unusual punishment. This argument lacks merit. In *Harris v. Wright*, 93 F.3d 581, 584-85 (9th Cir.1996), the Ninth Circuit held that a life sentence without the possibility of parole does not violate the Eighth Amendment when the crime is murder. It therefore stands to reason that petitioner's indeterminate 25 years to life sentence is not cruel and unusual. Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *Id.* at 751-52.

### C.    Conclusion

Accordingly, the state court's decision rejecting petitioner's claims of ineffective assistance of counsel was not an unreasonable application of the *Strickland* standard.

## IV.    Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). *See*

16

28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. *See id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

For the reasons set out above, jurists of reason would not find the result debatable.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. A Certificate of Appealability also is DENIED. *See* Rule11(a) of the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

Dated: August 5, 2013

SUSAN ILLSTON
United States District Judge